UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | | |
|---|---|---|
| KERMIT AUSTIN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 1:25-cv-9499 |
| | : | |
| | : | |
| TABBED, INC., GRANT PIGNIO, and | : | **COMPLAINT** |
| HOLDEN ELLARD | : | |
| | : | **JURY TRIAL DEMANDED** |
| Defendants. | | |

-----------------------------------------------------------x

Plaintiff Kermit Austin ("Austin" or "Plaintiff"), by and through undersigned counsel, alleges against defendants Tabbed, Inc. ("Tabbed" or the "Company"), and its co-founders Grant Pignio ("Pignio") and Holden Ellard ("Ellard") (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1. Kermit Austin is the co-founder and former Chief Technology Officer ("CTO") of Tabbed. This action arises from Defendants' failure to honor their promises and agreements to grant Austin a substantial equity interest and compensation in Tabbed in exchange for his leadership and services in rebuilding the Company's technology platform, providing critical intellectual property and licenses, and securing customers for Tabbed.

2. After inducing Austin to devote extensive time, resources, and proprietary technology, Defendants refused to honor their agreements, withheld compensation and reimbursements, attempted to extract an overbroad work-for-hire assignment through a separation and release agreement, and have been unjustly enriched by Austin's contributions.

3. Austin seeks damages and equitable relief for breach of contract, unjust enrichment, breach of the implied covenant of good faith and fair dealing, promissory estoppel, quantum

meruit, trade secret misappropriation under federal and state law, as well as declaratory relief establishing his rights to equity and intellectual property, specific performance, and injunctive relief.

4. Plaintiff is an individual and, at relevant times, resided in Florida and worked in, among other places, Georgia and Texas. He is a technology entrepreneur with extensive experience in restaurant payment systems and point-of-sale integrations.

5. Defendant Tabbed, Inc. is a corporation that, on information and belief, is organized under the laws of Delaware with business operations and investor outreach spanning multiple states, including New York. On information and belief, Tabbed's primary place of business is 447 Broadway, Suite 753, New York, New York 10013.

6. Defendant Grant Pignio is an individual who, on information and belief, now resides in New York or New Jersey and is a co-founder and executive of Tabbed.

7. Defendant Holden Ellard is an individual who, on information and belief, resides in Georgia and is a co-founder and executive of Tabbed.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1836 (Defend Trade Secrets Act) because this action includes federal questions, and under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Austin and Defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs. The Court also has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367.

9. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and/or Defendants are subject to the Court's personal jurisdiction here. Among other

things, Defendants engaged New York-based professionals and law firms in connection with negotiations and investor communications concerning Austin's equity and compensation; made and coordinated communications directed into this District; and conducted investor presentations and fundraising efforts that incorporated and relied upon Austin's role and contributions.

## FACTUAL BACKGROUND

A. Initial Engagement and Equity Agreement

10. In May 2023, after Tabbed received press attention, Austin initiated discussions with Pignio and Ellard and met in Dallas around May 15, 2023. The parties "hit it off," and Tabbed agreed to engage Austin as a sales consultant on a part-time basis for $88,000 per year and 4% equity.

11. Austin proposed templates for a stock agreement and offer letter to memorialize terms. Neither the stock agreement or offer letter were ever executed in writing.

12. Shortly thereafter, Tabbed invited Austin into engineering meetings, where Austin discovered that Tabbed lacked functioning point-of-sale ("POS") integrations, had no customers, and had an unsuitable technology stack for transaction processing.

13. Tabbed asked Austin to lead a comprehensive rebuild of its technology platform, to provide and integrate his POS licenses and Bluetooth-based table assignment technology, and to bring in his engineering leadership. The parties' relationship evolved rapidly from part-time sales consulting to Austin acting as CTO and co-founder.

14. By late June 2023, Tabbed circulated independent contractor and NDA/assignment drafts to Austin related to his original sales consultancy role. These drafts, which specifically referred to "work for hire" and contained copyright assignment provisions, were never signed either by Austin or anyone from Tabbed, as is required by the Copyright Act to be effective. By

3

mid-July 2023, Austin advised that his significant IP contributions warranted enhanced equity, and on or about July 17, 2023, Pignio agreed a "better deal" was required.

15. Within weeks, after Austin closed Tabbed's first sale (Alice Sushi in Dallas), Tabbed agreed to name Austin CTO and grant him approximately 11% equity, along with additional compensation.

16. Later that year, after a complete rebuild of the platform and successful launch at Alice Sushi, Tabbed increased Austin's equity to approximately 17% and added him as the third co-founder.

17. Tabbed also represented Austin as a co-founder in investor materials.

18. As Austin's responsibilities expanded, Austin and Pignio entered an oral agreement for a "side deal" under which Austin would receive $40 million upon a sale of $200 million or greater, confirming the parties' recognition of Austin's foundational role and substantial equity stake.

19. In or around April 2024, following Pignio's discussions with a potential acquirer at a valuation below the $200M side-deal threshold, Austin proposed an updated agreement reflecting 30% equity for his contributions and leadership. During a phone call the following day, when Austin insisted 30% was non-negotiable, Pignio responded, "I knew you were going to say that," and orally agreed to Austin's 30% equity. Austin also offered vesting, but Pignio insisted the equity be awarded immediately and stated he had already engaged counsel to formalize documents. Austin agreed to revisit cash compensation elements once investor funding was secured.

20. The agreements detailed above were oral agreements that were memorialized in writings via electronic mail between Austin, Pignio, and Ellard.

B. <u>Austin's Contributions and Intellectual Property</u>

21. Austin architected and rebuilt Tabbed's entire backend, authoring and co-authoring multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions, before the Company's November 2023 launch event in Dallas. During that launch event, Tabbed processed several hundred transactions with a 0% failure rate.

22. Austin supplied and integrated his NCR Aloha POS license, which enabled API access to the Aloha POS without a lengthy approval process, and later secured a Toast license; architected Tabbed's first POS integration with NCR Aloha; integrated Austin's proprietary Bluetooth table assignment technology (Spatial Recognition) to replace Tabbed's GPS-based system; re-architected the entire database schema; rebuilt the sales process and materials; trained staff; worked extensively in restaurants during and after launch; and closed significant accounts (including Buckhead Restaurant Group).

23. Austin relocated from Florida and resided with Ellard and Pignio in Georgia to fulfill his CTO/co-founder responsibilities.

24. Austin also covered extensive Company expenses with the parties' agreement that he would be repaid upon funding.

25. In late 2023 and early 2024, Tabbed encountered funding challenges and began missing payroll.

26. By February 2024, the founders stopped receiving payroll entirely.

27. Despite these troubles, Austin continued working without pay and covering expenses, relying on Pignio's repeated written assurances and representations that investor funding was imminent and that his equity and compensation would be honored.

C.  Unpaid Compensation and Expenses

28. By September 2024, Tabbed's fractional CFO audited past-due amounts and confirmed Austin was owed at least $17,818.53 in reimbursement expenses and $44,800 in unpaid work—totaling $62,618.53. Pignio repeatedly—and in writing—promised repayment upon funding.

29. Throughout September and October 2024, Pignio assured Austin that $500,000 to $1,000,000 of investment was imminent and directed Austin to take steps in reliance on those assurances, including pausing other paid work. Text messages documented assurances that wires were sent or expected "that week," and specific plans to repay Austin were proposed and agreed upon in serial emails between Austin and Pignio.

30. On October 10, 2024, Austin submitted a compensation plan designed to repay amounts owed without triggering investors' concerns over unreported liabilities.

31. Within minutes, Pignio agreed to the plan.

32. Defendants then paid other employees but did not pay Austin as promised. Despite repeated follow-ups, Defendants failed to honor the compensation plan or repay Austin. When Austin pressed for partial payment, Defendants attempted to cut off his access to systems while still relying on his work product, licenses, and integrations.

D.  Defendants' Refusal to Honor Equity and Compensation

33. Defendants have taken the position that Austin is entitled only to the original 4% equity and that the later agreements are not binding because documents were not finalized, notwithstanding clear mutual assent and reliance, Austin's status as CTO and co-founder, extensive performance, and Defendants' investor-facing representations.

34. Defendants have refused to grant Austin the equity promised, have failed to pay the amounts owed, and continue to benefit from the technology, licenses, integrations, and platform Austin built.

35. <u>Upon information and belief, Tabbed continues to make use of the software containing the contributions authored and/or co-authored by Austin while he worked as CTO of Tabbed, which contributions and software continue to be an integral part of the services Tabbed offers and which, on information and belief, are a significant part of Tabbed's business and its value to shareholders and investors.</u>

E. <u>Nature of Plaintiff's Trade Secrets and Defendants' Ongoing Misappropriation</u>

36. During his extensive tenure at Tabbed, and through substantial personal time, energy, and financial expense, Austin developed, owned, and maintained protectable trade secrets related to the Spatial Recognition technology. These trade secrets derive independent economic value from not being generally known or readily ascertainable by another person who can obtain economic value from the disclosure or use of the information, and are not accessible through public means, reverse engineering, or independent development by competitors.

37. These trade secrets, which Austin specifically disclosed to Defendants, and which Defendants knew or should have known were proprietary, specifically consist of: (i) the proprietary Bluetooth-based table assignment methodology and algorithms branded as Spatial Recognition, including device pairing logic, signal-strength normalization, triangulation heuristics, interference mitigation, and location-resolution rules; and (ii) the related source code, object code, repository structures, schemas, deployment scripts, and configuration files implementing Spatial Recognition and its associated POS integrations, including Austin's authored

and co-authored multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions.

38. Austin took reasonable measures to maintain the secrecy of these trade secrets by verbally communicating their proprietary nature, specifically branding and referring to his Bluetooth-based table assignment methodology as "Spatial Recognition" in all communications and relying on the confidentiality expectations established by the draft NDA/assignment documents circulated by Tabbed for Austin's CTO role.

39. Austin did not execute any assignment or work-for-hire agreement transferring ownership of his pre-existing IP, Spatial Recognition methodology, or POS licenses, and consistently communicated to Defendants that his proprietary technology, including the Spatial Recognition trade secrets, remained his unless and until equity and compensation agreements were finalized in writing consistent with the parties' assent.

40. Tabbed's products and services incorporating Austin's trade secrets were used and intended for use in interstate commerce and only under the auspices that Tabbed was using such information because Austin was a company owner. The POS integrations involved national vendors (including NCR Aloha and Toast) and were deployed and marketed across multiple states, including Texas, Georgia, New York, and beyond. Investor outreach, fundraising, and customer engagements relied on Austin's platform designs and technical achievements to position Tabbed's offerings in nationwide markets, and Tabbed conducted multistate presentations and deployments that depended on Austin's confidential know-how.

41. Defendants misappropriated Austin's trade secrets by acquiring, disclosing, and using them without Austin's consent and despite knowing, or having reason to know, that such

information was acquired by improper means or subject to a duty to maintain its secrecy or limit its use.

42. After inducing Austin to rebuild the platform and integrate his Spatial Recognition technology and POS licenses, Defendants continued to use those trade secrets to operate, market, and sell Tabbed's services.

43. Defendants represented Austin's IP as Tabbed's property in investor materials.

44. Defendants provided access and outputs of Austin's confidential technology to third parties.

45. Later, Defendants attempted to retroactively impose a sweeping work-for-hire assignment through a separation and release agreement that contradicted the parties' agreement and was never executed.

46. Defendants further cut off Austin's access to systems while retaining and deploying his code, integrations, and technical playbooks to serve existing and prospective customers, including at client sites secured by Austin.

47. Defendants' misappropriation was willful and malicious. Defendants were repeatedly informed that Austin's proprietary technology was not assigned, that his enhanced equity had been agreed and was to be immediately awarded, and that any IP transfer would be documented in alignment with those agreements.

48. Nevertheless, Defendants leveraged Austin's trade secrets to advance Tabbed's fundraising and sales, paid other employees ahead of Austin contrary to agreed plans, and continued to use Austin's technology after refusing to honor his equity and compensation.

49. Even today, Defendants are continuing to use software, including code from Austin's authored and co-authored multiple lines of code and code-level contributions, as

evidenced in GitHub commits, Linear tickets, and Prisma definitions, without accounting for its use. Defendants are taking financial advantage from their continuing use of Austin's software contributions.

50. Defendants' conduct evidences a deliberate strategy to obtain the benefits of Austin's trade secrets without paying for them and to retroactively impose ownership terms through overbroad language once Austin pressed for repayment and formalization.

51. As a direct and proximate result of Defendants' misappropriation, Austin has suffered damages, including the theft of his trade secrets, unjust enrichment to Defendants from the wrongful use and disclosure of his proprietary technology, and injury to the value and confidentiality of his IP and business information.

52. Austin's trade secrets are threatened with further disclosure and use unless enjoined, and Austin seeks injunctive relief to preserve their secrecy, prevent continued exploitation, and require the return and destruction of all materials containing or derived from his trade secrets.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

53. Austin realleges and incorporates paragraphs 1–52 as if fully set forth herein.

54. Defendants entered into enforceable agreements with Austin that, at minimum, granted him (a) co-founder and CTO status, (b) enhanced equity (initially ~16.78%; later agreed 30% equity, immediately awarded), (c) compensation for services, and (d) reimbursement of expenses advanced on Tabbed's behalf.

55. Austin fully performed or was excused from further performance, including rebuilding the platform, integrating POS licenses and proprietary Bluetooth technology, training

staff, securing customers, and continuing work without pay at Defendants' request and in reliance on funding assurances.

56. Defendants breached the agreements by refusing to issue the promised equity, failing to pay compensation and reimbursements, and attempting to retroactively impose a work-for-hire/assignment via a separation agreement that was never executed and contradicts the parties' prior agreement and course of dealing.

57. The value of the equity promised to Plaintiff is believed to exceed $8,000,000 based on upcoming capital raises establishing a valuation of at least $25,000,000.

58. As a result, Austin has suffered damages, including but not limited to unpaid compensation and expenses (no less than $62,618.53), the value of promised equity (including 30% agreed equity), and consequential damages.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

59. Austin realleges and incorporates paragraphs 1–52 as if fully set forth herein.

60. Defendants were enriched at Austin's expense by receiving the benefit of Austin's authoring and co-authoring multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions, platform rebuild, integrations, licenses, proprietary technology, sales efforts, and investor-facing co-founder/CTO narrative, while withholding agreed equity and failing to pay compensation and reimbursements.

61. Equity and good conscience require restitution to Austin from the value conferred and unjustly retained by Defendants.

## THIRD CAUSE OF ACTION
### (Declaratory Relief)

62. Austin realleges and incorporates paragraphs 1–52 as if fully set forth herein.

63. An actual, present controversy exists concerning Austin's rights to equity in Tabbed, including the parties' agreement to no less than 16.78% and later 30% immediately awarded, and Austin's status as co-founder and CTO.

64. An actual, present controversy exists concerning Austin's rights to equity in Tabbed, including the parties' agreement to no less than 16.78% and later 30% immediately awarded, and Austin's status as co-founder and CTO, as well as Austin's IP rights, including his authoring and co-authoring multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions.

### FOURTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

65. Austin realleges and incorporates paragraphs 1–52 as if fully set forth herein.

66. Defendants acted in bad faith to frustrate Austin's contractual rights and reasonable expectations, including by stringing him along on funding, refusing to document agreed equity and compensation, and leveraging his services and IP while withholding pay and equity.

67. As a result, Austin suffered damages, including the loss of equity, compensation, and related consequential damages.

### FIFTH CAUSE OF ACTION
### (Promissory Estoppel)

68. Austin realleges and incorporates paragraphs 1–52 as if fully set forth herein.

69. Defendants made clear and unambiguous promises of enhanced equity (no less than ~16.78%, later 30% awarded immediately) and repayment of accrued compensation and expenses, upon which Austin reasonably and foreseeably relied by relocating, continuing to work without pay, contributing licenses and technology, and foregoing other work.

70. Injustice can be avoided only by enforcing Defendants' promises, including issuing the agreed equity and paying amounts owed.

## SIXTH CAUSE OF ACTION
### (Quantum Meruit)

71. Austin realleges and incorporates paragraphs 1–52 as if fully set forth herein.

72. Austin provided valuable services as CTO/co-founder that Defendants accepted and benefitted from.

73. Equity and good conscience require payment of the reasonable value of those services.

## SEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

74. Austin realleges and incorporates paragraphs 1–52 as if fully set forth herein.

75. As co-founders and joint venturers, Pignio and Ellard owed fiduciary duties of loyalty and care to Austin. Pignio and Ellard breached those duties by denying agreed equity, misusing Austin's IP, including code Austin authored and co-authored multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions, and paying others ahead of Austin contrary to agreed plans. Pignio also advised Plaintiff to quit his part-time work at PepperHQ, claiming that Tabbed had secured investment.

76. Austin has suffered damages as a result of Pignio's and Ellard's misconduct.

## EIGHTH CAUSE OF ACTION
### (Accounting and Constructive Trust)

77. Austin realleges and incorporates paragraphs 1–52 as if fully set forth herein.

78. Austin seeks an equitable accounting of Tabbed's capitalization, investor proceeds, and benefits derived from his contributions.

79. Austin also requests the imposition of a constructive trust over equity interests and proceeds wrongfully withheld or derived from Austin's technology and licenses.

80. The imposition of a constructive trust and an accounting are necessary to prevent Defendants' unjust enrichment, rectify their breaches of fiduciary duty, and ensure Plaintiff receives the full benefit of his contributions, as Defendants have wrongfully obtained and retained equity interests, investor proceeds, and other benefits derived from Austin's technology and efforts.

## NINTH CAUSE OF ACTION
### (DTSA and Trade Secret Misappropriation)

81. Austin realleges and incorporates paragraphs 1–52 as if fully set forth herein.

82. Austin owns protectable trade secrets, specifically the proprietary Bluetooth-based table assignment methodology and algorithms branded as Spatial Recognition, its related source code, authored and co-authored multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions, and POS integration access.

83. Austin dedicated substantial time, energy, and personal funds to develop the Spatial Recognition technology and the proprietary methodology for linking dining checks with a customer's Tabbed account upon drink order placement, an innovation not generally known or readily ascertainable. Austin specifically disclosed these trade secrets, including related source code authored and co-authored multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions, to Defendants Pignio and Ellard during his work as CTO, providing detailed technical specifications, architecture diagrams, and demonstrations, such that Defendants understood the proprietary nature of this information and that Austin maintained ownership.

84. These trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, another person who can obtain economic value from their disclosure or use.

85. Austin took reasonable measures to maintain the secrecy of this information, including verbally communicating the proprietary nature of the Spatial Recognition technology to Defendants, consistently referring to it as 'my system' and contribution, and operating under confidentiality expectations reflected in draft NDA/assignment documents circulated by Tabbed, without sharing source code or documentation or entering into written NDAs specifically covering the Spatial Recognition technology. Austin also expressly communicated to Defendants that his proprietary technology and know-how remained his property absent a finalized written assignment.

86. Austin provided this information to Defendants for the limited purpose of furthering Tabbed's business, and did so without executing any assignment or work-for-hire agreement transferring ownership of his pre-existing intellectual property, Spatial Recognition methodology, or POS integration access.

87. Defendants acquired, disclosed, and used Austin's trade secrets without his consent and in breach of their duty to maintain the confidentiality or limit the use of such information. Defendants' misappropriation was willful and malicious, as evidenced by their continued use of Austin's technology, including code Austin authored and co-authored multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions, after being expressly informed of its proprietary status and their refusal to honor the parties' equity and compensation agreements.

88. The trade secrets at issue were used in, and intended for use in, products and services deployed in interstate commerce, including point-of-sale integrations and restaurant technology solutions marketed and sold across multiple states.

89. As a direct and proximate result of Defendants' misappropriation, Austin has suffered and continues to suffer damages, including but not limited to the theft of his trade secrets, unjust enrichment to Defendants, and injury to the value and confidentiality of his intellectual property and business information. There is a substantial threat of further misappropriation and disclosure unless Defendants are enjoined by this Court.

90. Accordingly, Austin seeks (a) injunctive relief prohibiting Defendants from using or disclosing his trade secrets, including the proprietary Bluetooth-based table assignment methodology, Spatial Recognition, its related source code, authored and co-authored multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions, and POS integration access, and requiring the return and destruction of all materials containing or derived from such information; (b) an award of actual damages and/or Defendants' unjust enrichment; (c) exemplary damages for willful and malicious misappropriation; and (d) reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3).

WHEREFORE, Plaintiff Kermit Austin respectfully requests that this Court enter judgment in his favor and against Defendants Tabbed, Inc., Grant Pignio, and Holden Ellard, and grant the following relief:

91. For the First Cause of Action (Breach of Contract), an award of compensatory and consequential damages, including but not limited to unpaid compensation, expenses, and the value of promised equity;

92. For the Second Cause of Action (Unjust Enrichment), an award of restitution for the value unjustly retained by Defendants;

93. For the Third Cause of Action (Declaratory Relief), a declaratory judgment that Plaintiff is entitled to the agreed equity in Tabbed, Inc. (no less than 16.78%, and later 30% immediately awarded), that Defendants must issue and record such equity, that Defendants may not retroactively strip Plaintiff's intellectual property rights, including his authoring and co-authoring multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions, and that Defendants' continued use of the software containing Austin's contributions is unlawful;

94. For the Fourth Cause of Action (Breach of Implied Covenant of Good Faith and Fair Dealing), an award of damages, including but not limited to the loss of equity, compensation, and related consequential damages;

95. For the Fifth Cause of Action (Promissory Estoppel), an order enforcing Defendants' promises, including the issuance of agreed equity and the payment of all amounts owed to Plaintiff;

96. For the Sixth Cause of Action (Quantum Meruit), an award for the reasonable value of services provided by Plaintiff;

97. For the Seventh Cause of Action (Breach of Fiduciary Duty), an award of damages to be proven at trial;

98. For the Eighth Cause of Action (Accounting and Constructive Trust), an order for an equitable accounting of Tabbed, Inc.'s capitalization, investor proceeds, and benefits derived from Plaintiff's contributions, and the imposition of a constructive trust over equity interests and proceeds wrongfully withheld or derived from Plaintiff's technology and licenses;

99. For the Ninth Cause of Action (DTSA and Trade Secret Misappropriation):

   a. Injunctive relief prohibiting Defendants from using or disclosing Plaintiff's trade secrets, specifically the proprietary Bluetooth-based table assignment methodology, Spatial Recognition, its related source code, authored and co-authored multiple lines of code and code-level contributions, as evidenced in GitHub commits, Linear tickets, and Prisma definitions, and POS integration access, and requiring the return and destruction of all materials containing or derived from such information;

   b. An award of actual damages and/or Defendants' unjust enrichment;

   c. An award of exemplary damages for willful and malicious misappropriation; and

   d. An award of reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3);

100. For all causes of action, an award of pre-judgment and post-judgment interest;

101. For all causes of action, an award of Plaintiff's costs and disbursements incurred in this action; and

102. For such other and further relief as this Court deems just and proper.

103. The claims in this complaint are based on the information presently available to the Plaintiff, and his investigation is ongoing. As a result, Austin may seek to add additional claims, including copyright claims, against Defendant or against other co-authors of the software being used by Tabbed, and/or against individuals who are making unauthorized use of software incorporating Austin's contributions, or third parties acting in concert with any of them, or who are vicariously or contributorily liable for the actions of Tabbed.

[REST OF PAGE INTENTIONALLY LEFT BLANK]

Dated: November 13, 2025
New York, New York

*/s/ Michael L. Simes*
MOSES & SINGER LLP
Michael L. Simes
Toby Butterfield
Liberty T. McAteer
John V. Baranello
405 Lexington Avenue, 12th Floor
New York, New York 10174
212.554.7861
msimes@mosessinger.com